UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WHITE COAT WASTE PROJECT, INC., *Plaintiff*, v. U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, *Defendants*. | Civil Action No. 1:22-cv-00006 (CJN) |

**MEMORANDUM OPINION**

The National Institutes of Health ("NIH") funds biomedical and behavioral research on animals by approving grants to foreign and domestic research entities. To ensure proper care of animals used in that research, Section 495 of the Public Health Services Act ("Services Act"), 42 U.S.C. § 289d, requires the Secretary of Health and Human Services, acting through the Director of NIH, to set guidelines for grant recipients to follow. In this suit, a watchdog group called White Coat Waste Project, Inc. ("White Coat") claims that NIH violated the Services Act by exempting foreign grant recipients from some of those guidelines. NIH moves to dismiss the complaint, on grounds that White Coat lacks standing and fails to assert an interest protected by the Services Act. The Court disagrees—at this stage in the proceedings, White Coat has adequately established that it has organizational standing and that its interests arguably fall within the zone of interests protected by the statute. The Court will thus deny NIH's motion to dismiss.

1

I.   Background

A.   Legal Framework

Each year, the federal government spends around $20 billion on animal research by providing grants, contracts, and additional funding to research entities. Am. Compl. ¶ 1, ECF No. 17. Both foreign and domestic entities are eligible to receive NIH funding for this research—indeed, about a quarter of eligible grantees are foreign laboratories. Declaration of Daniel Eduardo López Breña ("López Decl.") ¶ 28, ECF No. 24-3. Whether foreign or domestic, any institution that uses animals in NIH-funded research must comply with certain animal welfare requirements.

These requirements flow from the Services Act. The Act requires the Secretary to establish guidelines for the proper care of animals used in NIH-funded biomedical and behavioral research. 42 U.S.C. § 289d(a). Applicants for funding must, in turn, provide "assurances" that they comply with these guidelines. *Id.* § 289d(c)(1). No entity may receive funding for research involving animals unless NIH approves its animal welfare assurance. *Id.* § 289d(c)–(d).

As relevant here, NIH provides alternative ways for entities to obtain approval of their assurances. Domestic institutions must, among other things, set up an Institutional Animal Care and Use Committee ("animal care committee") to monitor the institution's compliance with applicable guidelines. *See* Public Health Service Policy on the Humane Care and Use of Laboratory Animals ("Humane Care Policy"), Secs. II, IV.A.3, Ex. 3, ECF No. 24-2. Animal care committees must keep certain records and file reports of violations with NIH. § 289d(b)(3). Foreign institutions, by contrast, have a choice: They can either set up an animal care committee, or they can submit evidence to NIH proving "that acceptable standards for the humane care and use of the animals in [NIH-funded] activities will be met." Humane Care Policy, Sec. II. This suit is (in part) about whether the Services Act permits that choice.

2

### B.  This Lawsuit

White Coat "is a bipartisan taxpayer watchdog organization." Am. Compl. ¶ 6. Its mission is to "unite animal-lovers and liberty-lovers to find, expose, and defund wasteful and cruel taxpayer-funded animal experimentation." *Id*. That mission, White Coat says, is frustrated by NIH's decision to exempt foreign grantees from the same requirements applicable to domestic grantees. And that exemption, White Coat continues, violates the plain text of the Services Act.

Specifically, White Coat contends that the Services Act requires *all* entities—foreign and domestic—receiving funds for animal research to "maintain an animal care committee to review, approve, and monitor animal experiments, and to ensure proper care for animals." *Id*. ¶ 1. Yet NIH has, according to White Coat, "enacted multiple contradictory and binding agency rules exempting foreign grant recipients of taxpayer money for animal experiments from maintaining an animal care committee." *Id*. As a result, White Coat has had to alter its operations and "redirect its limited resources to counteract and offset [NIH's] unlawful actions and omissions." *Id*. ¶ 7. For example, because the challenged exemption appears to relieve foreign entities from certain statutory record keeping and reporting obligations, White Coat allegedly cannot monitor compliance with animal welfare guidelines—and thereby expose animal mistreatment—through its regular practice of obtaining records from NIH through the Freedom of Information Act ("FOIA"). *See, e.g., id*. ¶ 93; López Decl. ¶¶ 6–10. White Coat instead has had to track down relevant information through other, more time-consuming methods. *See, e.g.*, López Decl. ¶¶ 44–45.

White Coat alleges that NIH violated the Administrative Procedure Act by exempting foreign entities from certain statutory requirements. Alternatively, White Coat alleges that the guidance at issue constitutes rulemaking under the APA and that NIH disregarded notice-and-

3

comment requirements. NIH moves to dismiss for lack of standing and failure to assert an interest protected by the Services Act.

## II. Legal Standards

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff must establish subject-matter jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At this stage, a plaintiff's burden is not heavy—the court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quotations omitted). The court may also "consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharms. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Standing is a predicate to subject-matter jurisdiction and requires a plaintiff to "show injury in fact that was caused by the conduct of the defendant[] and that can be redressed by judicial relief." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007). These elements—injury-in-fact, causation, and redressability—"must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. In other words, a "plaintiff's burden to demonstrate standing grows heavier at each stage of the litigation." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015). At the dismissal stage, all that is needed is a "plausible claim" that the plaintiff has standing. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quotations omitted).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts that "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). In assessing such a motion, the court must "treat the complaint's factual allegations as true and must grant the plaintiff the benefit of all inferences that can be derived from the facts alleged." *L. Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir. 2017) (cleaned up).

### III. Analysis

#### A. White Coat has adequately established organizational standing.

An organization "can assert standing on its own behalf, on behalf of its members or both." *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). White Coat asserts standing on its own behalf—also called organizational standing—so it must, just like an individual plaintiff, establish an injury in fact caused by the defendant and likely to be redressed by a favorable judicial decision. *Id.* To satisfy the injury-in-fact prong, White Coat must allege a "concrete and demonstrable injury to [its] activities" and a "consequent drain on [its] resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). "A mere setback to its abstract social interests is not sufficient." *Equal Rights Ctr.*, 633 F.3d at 1138 (quotations omitted). Nor is it enough for White Coat to rely on the diversion of its resources to litigation, education, or advocacy. *Food & Water Watch*, 808 F.3d at 919–20.

Determining whether White Coat's injury is "concrete and demonstrable" boils down to a two-part inquiry. First, the Court must ask whether NIH injured White Coat's interests. Second, the Court must ask whether White Coat used its resources to counter the harm. *Equal Rights Ctr.*, 633 F.3d at 1140. If NIH's conduct, as alleged, is in "direct conflict" with White Coat's mission, and if it "perceptibly impaired" White Coat's "ability to provide services" by causing an "inhibition of [White Coat's] daily operations," then White Coat has suffered an injury in fact. *Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (quotations omitted); *Food & Water Watch*, 808 F.3d at 919 (quotations omitted).

5

At this stage in the proceedings, White Coat has adequately shown that NIH's conduct injured its interests and that it has expended resources to counter the harm. Recall that White Coat's mission is to "unite animal-lovers and liberty-lovers to find, expose, and defund wasteful and cruel taxpayer-funded animal experimentation." Am. Compl. ¶ 6. White Coat alleges that NIH's decision to exempt foreign entities from having to maintain animal care committees is in "direct conflict" with its mission to find—and, by extension, expose and defund—"wasteful and cruel taxpayer-funded animal experimentation." That is so, White Coat explains, because it finds wasteful and cruel animal experimentation by relying on certain public records that are created only by grant recipients with animal care committees. López Decl. ¶ 7; Am. Compl. ¶ 7. White Coat then uses these public records, which are provided to NIH and obtained through FOIA, to "identify[ ], investigat[e], and monitor[ ] taxpayer-funded laboratories violating the law or other binding requirements contained in [NIH guidelines, including in the Humane Care Policy]." López Decl. ¶ 8; see § 289d(b)(3) (imposing on animal care committees certain record keeping and reporting obligations).

None of this is possible, claims White Coat, for foreign grant recipients operating without animal care committees. That is because such entities, by not having these committees, are allegedly not required to keep and produce the very records that White Coat ordinarily seeks through FOIA. Am. Compl. ¶ 7. The resulting "information blackout," it is claimed, forces White Coat to comb through various other (and less reliable) sources for the desired information. López Decl. ¶¶ 35, 43–70. And all this allegedly conflicts with White Coat's mission by making it harder—and sometimes impossible—for the organization to discover "wasteful and cruel taxpayer-funded animal experimentation."

In doctrinal terms, the upshot is that NIH's conduct has "perceptibly impaired" White

Coat's ability to provide services and "inhibit[ed]" its "daily operations" by depriving it of key information it relies on to further its mission. *Food & Water Watch*, 808 F.3d at 919. In this way, White Coat's alleged injury is highly analogous to one of the injuries asserted by the plaintiff in *People for the Ethical Treatment of Animals v. United States Department of Agriculture*, 797 F.3d 1087 (D.C. Cir. 2015) (*PETA*). There, PETA sued the Department of Agriculture for failing to apply statutory animal welfare requirements to birds. Because of this failure, USDA was also failing to produce inspection reports that PETA relied on to educate the public. The Court of Appeals held that USDA's inaction injured PETA's interests because the organization had suffered a "denial of access to bird-related . . . information" that it used to further its mission. *PETA*, 797 F.3d at 1094–95; *see also Action All. of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 937–38 (D.C. Cir. 1986) (finding concrete injury stemming from the restriction of information that groups used in their day-to-day activities); *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 619 (D.C. Cir. 2020) (relying on *PETA* to hold that "USDA's alleged inaction ha[d] perceptibly impaired . . . the [plaintiff's] organizational interests by depriving it of key information that it relie[d] on to fulfill its mission" (quotations omitted)).

NIH never fully grapples with *PETA*. For example, NIH stresses that neither the Services Act nor any other statute affords White Coat a legally protected interest in the desired information. *See, e.g.*, Defs.' Reply at 8, ECF No. 27. But the same was true in *PETA*. As Judge Millett noted in her separate opinion, nothing gave PETA a "legal *right* to such information" or required USDA "to make it public." *PETA*, 797 F.3d at 1103, 1106 (Millett, J., dubitante).

Nor is the Court persuaded by NIH's effort to reframe the injury in *PETA*. *See* Defs.' Reply at 10. To be sure, USDA's alleged inaction also "precluded PETA from preventing cruelty to and inhumane treatment of [birds] through its normal process of submitting USDA complaints."

7

*PETA*, 797 F.3d at 1094 (quotations omitted).  But the denial of "a means by which to seek redress for bird abuse" was just one of PETA's injuries; the other injury was the restriction of the flow of information used to further PETA's mission.  *Id.* at 1094–95 (agreeing that USDA injured PETA "in two respects"); *see also id.* at 1095 (identifying PETA's "*injuries*" as the "denial of access to bird-related . . . information . . . *and* a means by which to seek redress for bird abuse" (emphasis added)).  Nothing in *PETA* suggests that the restriction of information, standing alone, would have been insufficient to establish injury in fact.

     *PETA* controls this case in another critical respect.  Having held at step one of the inquiry that USDA injured PETA's interests, the Court of Appeals then detailed at step two all the ways PETA diverted its resources to offset the harm.  For example, USDA's failure to regulate birds caused PETA "'to expend resources to obtain information about the conditions of birds . . ., including through investigations, research, and state and local public records requests.'"  *Id.* at 1096 (quoting a declaration submitted by PETA).  The court went on:  "'But for the USDA's failure to regulate birds under the [statute], PETA would not need to undertake [these] extensive efforts.'"  *Id.* (same).  All told, "'PETA estimate[d] that, as a direct result of the USDA's failure to regulate birds . . ., it ha[d] been forced to expend more than $10,000 on staff attorney time not related to th[at] litigation and related expenses.'"  *Id.* (same).  These allegations, the Court of Appeals held, were enough to establish that "PETA redirected its resources in response to USDA's allegedly unlawful" inaction.  *Id.* at 1097.  And because PETA expended resources to counter injuries that "fit comfortably within [D.C. Circuit] organizational-standing jurisprudence," PETA had suffered an injury in fact.  *Id.*

Here, White Coat alleges that it diverted its resources in similar ways. For example, White Coat alleges that:

- The challenged conduct "has required [White Coat] to divert and redirect its limited resources to counteract and offset Defendants' unlawful actions and omissions." Am. Compl. ¶ 7.

- "To offset the information blackout described . . ., White Coat has disrupted its daily operations and diverted substantial resources exhausting alternative repositories of information." López Decl. ¶ 43.

- "Because of the Loophole, White Coat is forced to deviate from its normal operations and instead sort through an exponentially larger volume of documents, none of which originate from the very agency that funds the research in question, and rely on non-official reports of the taxpayer-funded foreign laboratories." *Id.* ¶ 44.

- "This includes, at a minimum, (1) researching the laws governing animal welfare in the countries in which foreign grantees are located, and comparing those laws with law and policy governing domestic grantees . . . to determine what animal welfare standards are even in place at such labs, if any, and (2) researching the following for indications of animal-welfare violations by foreign grantees: (i) academic databases and published research, and (ii) foreign news and social media, including reports of local and international animal welfare organizations." *Id.* ¶ 45.

- "But these other repositories of information, while better than nothing, cannot fill the informational void caused by the Loophole." *Id.* ¶ 46.

- In total, two White Coat staff members have devoted substantial time to counteract the effect of NIH's allegedly unlawful action—that additional time, as a proportion of those employees' salaries, is estimated to be worth over $25,000. *Id.* ¶ 82; Declaration of Justin Goodman ¶ 12, ECF No. 24-4.

As in *PETA*, these specific allegations do not detail "self-inflicted" harms caused by White Coat's "own budgetary choices." *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994). Said another way, this use of resources is not for the purpose of "litigation, investigation in anticipation of litigation, or advocacy." *Food & Water Watch*, 808 F.3d at 919. Rather, White Coat claims that it expends resources "in response to, and to counteract, the effects of [NIH's] alleged unlawful acts." *PETA*, 797 F.3d at 1097 (quotations omitted); *see Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132–33 (D.C.

9

Cir. 2006) (holding that, at the dismissal stage, an organization alleging that it diverted "significant time and resources" had adequately established organizational standing); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) (observing that an organization diverts resources for purposes of organizational standing when it diverts personnel and time to activities in response to allegedly illegal acts).

In sum, White Coat has adequately shown, at this stage of the litigation, that it is suffering a "concrete and demonstrable injury to [its] activities" and a "consequent drain on [its] resources." *Havens Realty*, 455 U.S. at 379. It has diverted resources to counter NIH's allegedly unlawful failure to apply the Services Act to foreign grant recipients, and its alleged injury—the loss of information it uses to carry out its mission—parallels one of the injuries accepted by the Court of Appeals in *PETA*. White Coat has thus made a sufficient showing of injury in fact.[1]

---

[1] Although NIH disputes only injury in fact, the Court must assure itself that causation and redressability are satisfied as well. Based on the allegations in the complaint, White Coat has established a "plausible link between the agency's action, the informational injury, and [its] activities." *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 122 (D.C. Cir. 1990). To be sure, granting White Coat the requested relief would not guarantee access to the desired information; White Coat still must rely on FOIA. But importantly, this is not a case in which redressability is unduly speculative because it turns on the discretion of a third party. FOIA, after all, carries a "strong presumption in favor of disclosure [and] places the burden on the agency to justify the withholding of any requested documents." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). And true to its purpose, FOIA has proved a reliable tool for White Coat. López Decl. ¶¶ 9–25 (detailing success in using FOIA). At this stage in the proceedings, the Court is satisfied that White Coat meets all the requirements for Article III standing.

As for White Coat's claim about notice and comment, NIH's challenge to procedural standing falls apart because White Coat has adequately alleged a concrete injury. *See United Transp. Union v. ICC*, 891 F.2d 908, 918 (D.C. Cir. 1989) ("[B]efore we find standing in procedural injury cases, we must ensure that there is some connection between the alleged procedural injury and a substantive injury that would otherwise confer Article III standing."). White Coat is not, as NIH contends, seeking to vindicate "a procedural right *in vacuo*." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

### B. White Coat asserts an interest arguably protected by the Services Act.

Even if a plaintiff satisfies the minimum requirements for Article III standing, it still may be the wrong party to challenge agency action. The "zone of interests" test ensures that the proper plaintiff hails an agency to court by limiting APA review to plaintiffs whose interests "arguably" fall "within the zone of interests to be protected by the statute." *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 444 (D.C. Cir. 1998). Despite its jurisdictional overtones, "the zone of interests test is a merits issue" and "does not implicate subject-matter jurisdiction." *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 588 (D.C. Cir. 2022) (quotations omitted). NIH thus contends, under Rule 12(b)(6), that White Coat fails to state a claim because "the Services Act does not protect [its] interest in acquiring more information about foreign recipients of NIH funding." Defs.' Mot. to Dismiss at 17, ECF No. 21.[2]

In the APA context, "the zone of interests test is generous and relatively undemanding." *Animal Legal Def. Fund*, 154 F.3d at 444; *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014). Indeed, the test "conspicuously include[s] the word 'arguably' . . . to indicate that the benefit of any doubt goes to the plaintiff." *Lexmark*, 572 U.S. at 130 (quotations omitted). For a plaintiff to fall within a statute's zone of interests, the statute need not "directly regulate the plaintiff." *CSL Plasma*, 33 F.4th at 589. Nor need there be "specific congressional intent to benefit the plaintiff." *Id.* The "analysis focuses, not on those who Congress intended to benefit, but on those who in practice can be expected to police the interests that the statute protects." *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1075 (D.C. Cir. 1998). That said, "an organization must show more than a general corporate purpose to promote the interests to which

---

[2] The Parties dispute whether a zone of interests analysis is required given White Coat's characterization of its claims as *ultra vires*. Because the Court holds that White Coat satisfies the zone of interests test at this stage, it need not resolve the dispute.

11

the statute is addressed." *Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 503 (D.C. Cir. 1994). The organization instead must show that it is a "suitable challenger[]," that is, a party "whose interests coincide systematically, not fortuitously with those of intended beneficiaries." *Twin Rivers Paper Co. LLC. v. SEC*, 934 F.3d 607, 616 (D.C. Cir. 2019) (quotations omitted). "These rules are designed to prevent litigation by parties whose suits are more likely to frustrate than to further statutory objectives." *Id.* (quotations omitted).

The first step, then, is to identify the interests protected by the Services Act, considering "the purposes of the specific statutory provision that is at issue . . ., read in the context of the statutory scheme as a whole." *Mova Pharm. Corp.*, 140 F.3d at 1074–75. Section 289d(a)(3) provides that the Secretary shall establish guidelines for "[t]he organization and operation of animal care committees" at institutions receiving federal funds for biomedical and behavioral research on animals. And § 289d(b) governs the creation, makeup, and responsibilities of these committees. The committees are to "review the care and treatment of animals in all animal study areas and facilities of the research entity at least semi-annually to evaluate compliance with applicable guidelines established under subsection (a) for appropriate animal care and treatment." § 289d(b)(3)(A); *see also* § 289d(a)(1)–(2) (providing that the Secretary shall establish guidelines for the "proper care" and "treatment" of animals "used in biomedical and behavioral research").

The committees must also certify that reviews have been conducted and report to NIH any violations of established guidelines or assurances. § 289d(b)(3)(C). If NIH determines that an entity receiving federal funds fails to meet applicable guidelines for animal care and treatment, then NIH must, upon providing notice and an opportunity for corrective action, "suspend or revoke" the entity's grant or contract. § 289d(d). From top to bottom, the text of the statute makes plain that its purpose is to ensure proper care and treatment of animals used in federally funded

research. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982) ("There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." (quotations omitted)).

This statutory purpose aligns with White Coat's mission "to find, expose, and defund wasteful and cruel taxpayer-funded animal experimentation." Am. Compl. ¶ 6. NIH frames the matter differently, contending that White Coat cannot satisfy the zone of interests test unless it shows that the Services Act "protects its right to receive the specific information about institutions with NIH approved foreign assurances." Defs.' Reply at 16. But NIH takes a cramped view of White Coat's interests. Although "claims of informational injury can surmount the zone of interests threshold only in very special statutory contexts," *Animal Legal Def. Fund*, 23 F.3d at 502, White Coat alleges more than an informational injury—it alleges a distinct injury to its organizational interest in combating "wasteful and cruel taxpayer-funded animal experimentation," and *that* is the injury for which the Court has found standing, *see supra* at 5–10. True, this organizational injury stems from a restriction on the flow of information. But it does not turn on White Coat suffering informational harm in a doctrinal sense—that is, on White Coat being deprived of information to which it is legally entitled. *See PETA*, 797 F.3d at 1094–95 (basing organizational injury on the restriction of information, even though the statute did not confer a legal right to the information).

To be sure, White Coat does not allege that it is an intended beneficiary of the Services Act. And NIH is right that White Coat "must show more than a general corporate purpose to promote the interests to which the statute is addressed." *Animal Legal Def. Fund,* 23 F.3d at 503. But as explained above, "protected interests" include those asserted by "suitable challengers," which are parties whose "interests are sufficiently congruent with those of the intended

13

beneficiaries that the litigants are not more likely to frustrate than to further statutory objectives." *Mova Pharm. Corp.*, 140 F.3d at 1075 (cleaned up).

White Coat likely falls within this category. Here again, the legal path has already been traveled by PETA. In *PETA v. Perdue*, the court held that PETA fell within the zone of interests protected by the Animal Welfare Act ("AWA"). 464 F. Supp. 3d 300, 310 n.4 (D.D.C. 2020). In so holding, the court observed that "[t]he animals protected by the AWA are uniquely incapable of defending their own interests in court." *Id.* (quotations omitted). For that reason, "PETA, as a group dedicated to protecting animals' interests, [was] one organization who might be expected to police animals' interests under the AWA, thereby satisfying the zone of interests test." *Id.* (quotations omitted); *see also Animal Welfare Inst. v. Kreps*, 561 F.2d 1002, 1007 (D.C. Cir. 1977) ("Where an act is expressly motivated by considerations of humaneness toward animals, who are uniquely incapable of defending their own interests in court, it strikes us as eminently logical to allow groups specifically concerned with animal welfare to invoke the aid of the courts in enforcing the statute."). White Coat, like PETA, is an organization concerned with animal welfare. And (at risk of stating the obvious) the animals protected by the Services Act are no more capable of defending their interests than the animals protected by the AWA. White Coat is therefore an organization that "in practice can be expected to police the interests that the statute protects." *Mova Pharm. Corp.*, 140 F.3d at 1075.[3]

---

[3] NIH argues that White Coat is not a suitable challenger because the Services Act "does not prescribe any particular role for an organization such as White Coat." Defs.' Reply at 17. But NIH cites no authority suggesting that this fact places White Coat outside the statute's zone of interests. *Cf. Animal Legal Def. Fund*, 23 F.3d at 503 (finding that the terms of the statute specifically assigned oversight responsibilities to private institutions other than the plaintiffs, thus making clear that the plaintiffs were "not the intended representatives of the public interest in animal welfare"). Because this is NIH's motion to dismiss, it "bears the burden of persuading the Court that [White Coat's] claims must be dismissed." *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 48 (D.D.C. 2020). Given that burden, as well as the fact that "the benefit of any

For all these reasons, the Court holds that White Coat has shown that it "arguably" falls within the zone of interests protected by the Services Act. Put conversely, the Court cannot say, at this juncture, that White Coat's interests "are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

## IV.   Conclusion

The Court denies NIH's motion to dismiss. NIH's related motion for relief from Local Civil Rule 7(n)(1) is accordingly denied as moot. A separate Order will issue today.

DATE:  August 2, 2023

CARL J. NICHOLS
United States District Judge

---

doubt goes to the plaintiff," *Lexmark*, 572 U.S. at 130 (quotations omitted), the Court will allow this case to proceed.